IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| AVERY L. SMITH, #155412, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:17-CV-29-ALB |
| | ) | |
| CORIZON HEALTH SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION[1]**

This 42 U.S.C. § 1983 action is pending before the court on a complaint and amendments thereto filed by Avery L. Smith, an indigent state inmate.  In the instant case, Smith challenges the constitutionality of medical treatment provided to him for a cyst on his right foot during a prior term of incarceration at the Ventress Correctional Facility.  The defendants remaining in this case are Corizon Health Services, Nurse Nettie Burks, Dr. John Peasant, and Dr. Hugh Hood, medical care providers for the state prison system at the time of the treatment about which Smith complains, Dr. Wilford S. French, a radiologist employed by Montgomery Radiology Associates, and Karla Jones, the warden of Ventress during the time relevant to the complaint.  Smith seeks monetary damages from the defendants.

---

[1]The documents and page numbers cited herein are those assigned by the Clerk of this court in the docketing process.

The defendants filed special reports, supplemental special reports and relevant evidentiary materials in support of their reports — including affidavits and medical records — addressing the claims presented by Smith.  In these documents, the defendants assert that at all times they provided proper medical treatment to Smith for his cyst and adamantly deny any violation of this inmate's constitutional rights.

On August 4, 2017, the court issued an order directing Smith to file a response to the arguments set forth by the defendants in their special reports and supplements thereto and advising him that his response should be supported by affidavits or statements made under penalty of perjury and other appropriate evidentiary materials.  Doc. 96 at 2.  This order specifically cautioned the parties that "**unless within fifteen (15) days from the date of this order a party files a response in opposition which presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to the order] and **without further notice to the parties** (1) treat the special report[s] and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion[s] for summary judgment in accordance with the law."  Doc. 96 at 3.

On April 6, 2017, Smith filed an unsworn response and supporting evidentiary materials arguing that he had exhausted the grievance procedure provided by Corizon.  Docs. 29, 29-1 & 29-2.  In response to the order directing that he respond to the defendants' special reports, Smith filed an unsworn response and supporting evidentiary materials,

Docs. 97, 97-1, 97-2 & 97-3, and an unsworn supplemental response with attached medical records.  Docs. 98, 98-1 & 98-2.

Pursuant to the directives of the order entered on August 4, 2017, the court deems it appropriate to treat the defendants' special reports and their supplemental special reports as motions for summary judgment.  Upon consideration of the defendants' motions for summary judgment, the evidentiary materials filed in support thereof, the sworn complaint and the plaintiff's responses in opposition, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed. R. Civ. P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving

party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). In civil actions filed by inmates, federal courts "must distinguish between

evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves the same purpose of an affidavit for purposes of summary judgment).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted.  *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).  The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986), Fed. R. Civ. P. 56(e).  "A mere 'scintilla' of evidence supporting the supporting party's position will not suffice[.]" *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Only disputes

involving material facts are relevant, materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  At the summary judgment stage, this court should accept as true "statements in [the plaintiff's] verified complaint, [any] sworn response to the officers' motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [Plaintiff's] sworn statements are self-serving, but that alone does not permit [the court] to disregard them at the summary judgment stage . . . .  Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."). However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will

not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Chamption Int'l Corp*., 907 F.2d 1077, 1081 (11th Cir. 1990).  In addition, conclusory allegations based on purely subjective beliefs of a plaintiff and assertions of which he lacks personal knowledge are likewise insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24; *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (holding that to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525. Thus, a plaintiff's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case. Here, after a thorough and exhaustive review of all the evidence which would be admissible at trial, the court finds that Smith has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

## III. DISCUSSION

Smith alleges that the defendants denied him adequate medical treatment for a cyst on his right ankle. In their responses, the defendants adamantly deny acting with deliberate indifference to Smith's medical needs with respect to this cyst.

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must, at a minimum, show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the

knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal

to treat or a delay in [the acknowledged necessary] treatment").

Under well-settled law, neither medical malpractice nor negligence constitutes

deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for delierate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . .,

Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate

indifference to that need; and (3) causation between that indifference and the plaintiff's

injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). When seeking

relief based on deliberate indifference, an inmate is required to show "an objectively

serious need, an objectively insufficient response to that need, subjective awareness of facts

signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk of harm to the prisoner).  Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively serious medical need[] . . . and second, that the response made by [the defendant] to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnos[is] or treat[ment], or even [m]edical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted).  To proceed on a claim challenging the constitutionality of medical care "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986); *Estelle*, 429 U.S. at 106 (holding that neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated."); *Farmer*, 511 U.S. at 836 (observing that a complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.); *Kelley v. Hicks*, 400 F.3d 1281, 1285 (11th Cir. 2005) (holding that "[m]ere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F. App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of

inmate's complaint because "misdiagnosis and inadequate treatment involve no more than medical negligence.").

Additionally, "to show the required subjective intent . . ., a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things: aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted) (alterations in original).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.   When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery County Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks and citation omitted). Moreover, the law is clear that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).

**1. The Correctional Defendant – Warden Karla Jones**.  Smith argues that Warden Jones is liable for treatment provided to him by the medical defendants because she "received a complaint from Plaintiff concerning treatment" he received from the prison's medical personnel and, rather than interjecting a different mode of treatment, merely sent a copy of the complaint to Nurse Burks and advised Smith "that she hope[s] he accepts the doctor's recommendation[.]"  Doc. 24 at 2.  In her answer, Warden Jones denies any responsibility for providing medical treatment to inmates and states that such is the exclusive responsibility of the contract medical care provider, Corizon, and its employees.  Doc. 44 at 1.  Furthermore, it is clear from the medical records and affidavits filed by the medical defendants that all decisions related to medical care provided to Smith were made by employees of Corizon and such decisions were based on the professional judgment of these individuals after their evaluations of Smith's condition.  Thus, Smith has failed to establish deliberate indifference on the part of Warden Jones as he has not demonstrated that this defendant disregarded any known serious risk to his  health as he concedes she referred his complaint to medical personnel who, unlike herself, possessed the knowledge and ability to provide medical treatment to Smith.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255.

Insofar as Smith seeks to hold Warden Jones liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge*

> *v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be
> brought against managing officers of a prison absent allegations that they
> were personally connected with the alleged denial of treatment). Moreover,
> "supervisory [correctional] officials are entitled to rely on medical judgments
> made by medical professionals responsible for prisoner care. *See, e.g.,*
> *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849
> F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198
> Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

For the foregoing reasons, the court concludes that defendant Jones is entitled to summary judgment.

**2. <u>The Medical Defendants.</u>**  Smith alleges Dr. Peasant and Nurse Burks acted with deliberate indifference to a "bump on his right foot" when they failed to re-schedule him to see an outside orthopedic specialist in February of 2015.  Doc. 1 at 3.  He also alleges that Dr, Peasant misdiagnosed the bump "as a 'Ganglion Cyst.'"  Doc. 1 at 3. Additionally, Smith contends that these defendants, absent a biopsy or culture of the cyst to determine whether it was cancerous,  "attempted to pressure [him] into having a surgery that [he deemed] unnecessary[,]" but Smith "denied surgery."  Doc. 1 at 3.  Next, Smith complains that Dr. Hood consulted with Dr. Peasant which resulted in Dr. Peasant deciding to "monitor the cyst on [his] ankle on site" rather than referring him to an off-site orthopedic specialist for monitoring.  Doc. 15 at 1.  Finally, Smith simply asserts that Dr. French contributed to his "pain and suffering" related to the cyst.  Doc. 24 at 1.  He does not identify how Dr. French acted with deliberate indifference.

The medical defendants submitted several affidavits and relevant medical records contemporaneously compiled during the treatment process in response to the claims

presented against them by Smith.  The details of medical treatment provided to Smith set

forth by the defendants in their affidavits are corroborated by these medical records.

In his initial and supplemental affidavits, Dr. Peasant, Smith's attending physician

at Ventress, addresses the allegations of deliberate indifference, in relevant part, as follows:

> I have reviewed and I am aware of the claims alleged by inmate Avery L.
> Smith (AIS #155412).  I am aware that Mr. Smith alleges that he did not
> receive adequate and proper medical treatment for a "bump" on his right foot.
> . . . .
>
> On July 4, 2014, Mr. Smith completed a sick call request stating that he had
> noticed swelling on the outside of his right ankle.
>
> Mr. Smith was seen in the health care unit at the Ventress Correctional
> Facility on July 6, 2014.  Mr. Smith informed the nurse that he had
> experienced a knot on his right ankle for approximately three weeks.
>
> An x-ray was taken of Mr. Smith's right ankle on July 7, 2014.  The
> radiologist read the x-ray as follows:
> Exam:  Ankle complete, Min 3v right.
> Results:  Right ankle findings:
> Multiple views of the right ankle demonstrate no acute fracture or
> dislocation. The mortise is grossly maintained. The tibiotalar articulation
> is within normal limits.  No significant degenerative changes are noted.
> Impression:  No acute osseous abnormality of the right ankle.
> Conclusion:  No acute osseous abnormality identified.
>
> On July 11, 2014, an appointment was made for Mr. Smith to be seen by the
> medical doctor.
>
> Mr. Smith had an appointment to be seen by me, as the Medical Director, on
> August 25, 2014.  However, Mr. Smith did not follow up with the scheduled
> appointment.
>
> On August 29, 2014, another appointment was made for Mr. Smith to be seen
> by me on September 3, 2014.
>
> ***

I personally saw and examined Mr. Smith on September 3, 2014.  My presumed diagnosis was that of a lateral ankle ganglion cyst.  Ganglion cysts are non-cancerous lumps that most commonly develop along the tendons or joints of an individual's wrists or hands.  They also may occur in the ankles and feet.  Ganglion cysts are typically round or oval and are filled with jelly like fluid. Small ganglion cysts can be pea sized, while large ones can be around an inch in diameter.  Ganglion cysts can be painful if they press on a nearby nerve.  Their location can sometimes interfere with joint movement.

I ordered an appointment for Mr. Smith to be seen by Dr. Tai Chung an orthopedi[c] specialist in Montgomery, Alabama.

Mr. Smith was in fact seen by Dr. Chung on September 25, 2014.  Dr. Chung indicated that Mr. Smith had a soft tissue mass on his right ankle.  Dr. Chung ordered an MRI and indicated that he was to see Mr. Smith again after the MRI and that Mr. Smith may in fact need[] to have the mass removed subsequent to results from the MRI.  Dr. Chung's notes from September 25, 2014 stated as follows:
He is a 44 year old gentleman referred from the Ventress Correctional Facility with a mass over his right ankle for the past four months.  He had no recent trauma, but he did have several sprains in the past.
PMH [Past Medical History]:  Unremarkable
Meds:  None
Allergies:  None
Exam:  There is a 2-3 cm. soft tissue mass on the medial aspect of the lateral malleolus.  There is no tenderness, redness, or increased warmth. He can move his ankle and toes well.  Sensation is okay to light touch. DP pulse is present.
X-fays right ankle:  No obvious bony abnormality; ? old navicular injury.
IMP:  soft tissue mass, right ankle.
P:  MRI right ankle and see me after same.

An MRI was taken of Mr. Smith's right ankle on October 23, 2014.  The MRI was read by the radiologist as follows:
MRI of the right ankle:
Indication:  Right ankle pain.
Findings:
The Achilles Tendon is intact.  There is some mild edema seen in kager's fat pad.  The anterior talofibular ligament, calcaneofibular ligament, and posterior talofibular ligaments are intact.  The posterior tibial tendon, flexor hallucis longus tendon, flexor digitorum longus tendon, peroneus brevis tendon, and peroneus longus tendon are intact.  The proximal

aspect of the plantar fascia appears within normal limits. There is an osteochondral lesion seen in the medial talar dome which measures approximately five mm.

Just anterior and inferior to the lateral malleolus, there is an multilocular cystic lesion identified. The largest cystic area measures 2.2 x 2.0 cm. Smaller cysts are seen inferior to this. Some of the smaller cysts appear to have some low T2, intermediate T1 signal noted. There is some surrounding subcutaneous edema noted in this region. There was no convincing soft tissue mass associated with this. The area does not appear to connect with the joint. There is no osseous destruction seen. There is some subtle marrow edema noted in the navicular.

Impression:

1. Subcutaneous multilocular fluid connection seen adjacent to the distal fibula. Etiology is uncertain. This could represent some type of sebaceous cyst, a typical ganglion, and much less likely soft tissue malignancy. Orthopedic consultation is recommended.

2. Osteochondral lesion of the medial talar dome.

3. Mild edema within Krager's fat pad.

I personally saw Mr. Smith subsequent to this MRI on October 27, 2014. I reviewed the results of the MRI, gave a physical examination of Mr. Smith, and initially ordered a follow up meeting with the orthopedist, Dr. Chung.

However, after a consultation with Hugh Hood, MD, the Regional Medical Director, I decided to monitor the cyst on Mr. Smith's ankle on site with a plan to send Mr. Smith . . . to Dr. Chung if [there] were any negative changes in the cyst on Mr. Smith's ankle.

After reviewing the MRI [and the consultation with Dr. Hood,] I did not think at that juncture that the cyst need surgical intervention. Therefore, the follow up appointment with an orthopedist was not medically necessary at that time.

On December 19, 2014, I personally saw Mr. Smith in the health care unit and evaluated Mr. Smith's condition. Mr. Smith had good range-of-motion in the right ankle and Mr. Smith's only complaint was the pain [when] getting off the top bunk. Therefore, I wrote a bottom bunk profile for Mr. Smith. My recommendation at that time was to continue to monitor Mr. Smith's condition for any changes in the ganglion cyst on the right ankle.

On February 5, 2015, Mr. Smith was seen in the health care unit complaining of right ankle pain that he had experienced, according to Mr. Smith, since July 2014.

On February 12, 2015, I again saw and evaluated Mr. Smith.  Mr. Smith was complaining of right ankle discomfort.  However, the cyst appeared to be reduced in size.

On February 12, 2015, Mr. Smith was prescribed an arch support, insoles and a bottom bunk profile.

Mr. Smith was seen at the [Ventress] health care unit for an inmate body chart on April 23, 2015.  Mr. Smith was ambulating with a steady gait and denied any pain or discomfort at that time.

Mr. Smith was . . . seen at the [Kilby] health care unit [on return from court] for a body chart on July [30], 2015.  Again, Mr. Smith [did not complain of any ankle pain.  It appears that Smith returned to Ventress in November of 2015].

I again saw Mr. Smith on November 9, 2016.  The ganglion cyst on Mr. Smith's right ankle appeared to have increased in size.  Therefore, an appointment was made for Mr. Smith to be seen by the orthopedist, Dr. Chung.

The fact that Mr. Smith did not see Dr. Chung from October 2014 through November 2016 did not cause Mr. Smith any adverse medical issues.  An appointment was made for Mr. Smith to See Dr. Chung in November of 2016 due to the fact that I noticed that the cyst had become larger in November of 2016.

Mr. Smith was seen by Dr. Chung on November 16, 2016.  Dr. Chung discussed removal of the ganglion cyst from Mr. Smith's right ankle and Mr. Smith, according to Dr. Chung's notes, agreed to proceed with the surgery.

On November 21, 2016, Mr. Smith signed a Release of Responsibility stating that he did not want to go forward with the removal of the cyst as recommended by Dr. Chung.  The Waiver of Responsibility was in fact signed by Avery Smith.

Thereafter, on November 22, 2016, Mr. Smith completed a sick call request asking for Dr. Peasant to reschedule the surgery on his right ankle.

On December 9, 2016, I saw Mr. Smith again in the health care unit at Ventress.  Mr. Smith complained that he had noticed discharge coming from

the cyst after taking a shower.   Therefore, Mr. Smith was prescribed
antibiotics due to the wound.

Mr. Smith was followed closely by the medical staff during his stay in the
infirmary.  It was noted on the infirmary history on December 9, 2016, that
Mr. Smith's ankle mass had ruptured on December 8, 2016.  It was also noted
that Mr. Smith had refused surgery as recommended by Dr. Chung several
weeks prior.

On December 12, 2016, Mr. Smith had an x-ray taken of his right ankle.  The
radiologist read the x-ray as follows:
Ankle complete, min 3v right
Results:   The ankle mortise is well-preserved without any fracture or
dislocation.  Bony ossification is normal and there is no soft tissue swelling.
Conclusion:  Normal right ankle.

On December 13, 2016, Mr. Smith was seen with a follow up appointment
with Dr. Chung.  Dr. Chung's notes of that date state as follows:
He was previously scheduled for removal of cyst from his right foot.  He
changed his mind and did not want the surgery.  The cyst has since burst
open.
Exam:  1 cm wound over dorsum right foot.  Shallow.  No redness.  No
purulence.
P:  Redress wound.  Wet to dry dressing daily with normal saline.  Oral
antibiotics.  See me in one month.

[Mr. Smith was seen by Dr. Peasant in the health care unit at Ventress on
December 14, 2016 and an order was placed for Mr. Smith to routinely return
to the health care unit to replace the dressing on his ankle until it healed.]

On December 17, 2016, I again made [a] recommendation that Mr. Smith
was again to be seen by Dr. Chung.  I noted on my consultation request that
surgery was previously scheduled for Mr. Smith with Dr. Chung.  However,
Mr. Smith changed his mind and did not want to go forward with the surgery.
It was also noted on the report of December 17, 2016 that Mr. Smith
experienced a rupture of the cyst on December 8, 2016.  Smith was continued
on antibiotics.

. . . .

I made the medical decision to monitor Mr. Smith in October 2014 and not
return him to see the orthopedist.  I made this decision based upon my

medical judgment as Mr. Smith['s] Medical Provider.  The decision I made in October 2014 did not have any negative effects on Mr. Smith's medical condition.

\*\*\*

Mr. Smith was again seen at the health care unit on December 19, 2016, for a follow-up appointment due to the rupture of Mr. Smith's cyst.

Mr. Smith was again seen in the health care unit on January 9, 2017.  The cyst on Mr. Smith's ankle was noted to be healing.

Mr. Smith was again seen in the health care unit on January 13, 2017.  The area where the cyst had been was noted as being much smaller and the wound was cleansed and dressed by the Registered Nurse.

On February 17, 2017, Mr. Smith completed a sick call request stating that swelling had returned on his right ankle.  An appointment was made for Mr. Smith to see me on February 23, 2017.

Mr. Smith was seen in the health care unit by a nurse on February 20, 2017.  The nurse noted that Mr. Smith had complained of swelling in his right foot for three days.  The nurse noted that Mr. Smith's ankle was slightly swollen but no indications of any redness.  The nurse noted that Mr. Smith refused any pain medication.

Mr. Smith did not show up for his appointment to see me on February 23, 2017.

Mr. Smith completed another sick call request on April 14, 2017.  Mr. Smith noted on the sick call request that the cyst on his right foot had reoccurred and that he was suffering from pain as the result of the cyst.  Mr. Smith was seen in the health care unit by a nurse on April 17, 2017.  Mr. Smith was complaining of pain in his right leg and hip.

Mr. Smith was seen in the health care unit on April 20, 2017 and an x-ray was ordered of Mr. Smith's right hip and right ankle.  Mr. Smith was also ordered Tylenol 650 mg. for 60 days.

I personally saw and evaluated Mr. Smith [on] April 20, 2017.  I indicated in my notes that I had not seen Mr. Smith since January 9, 2017, since Mr. Smith had not completed a sick call request to be seen by me.  I noted that

Mr. Smith had been seen and treated by the nurses and wound care specialists. Mr. Smith reported to me that the cyst had healed subsequent to its rupture but had reappeared. According to Mr. Smith, the cyst on his right ankle was not causing him as much pain as the previous cyst. The pain being experienced by Mr. Smith in his right hip was not related to the cyst on his right ankle.

Mr. Smith was seen at UAB Orthopedics on May 19, 2017. The notes from the medical provider state as follows:

> Chief Complaint:
> Patient complains of right ankle pain.
> History of present illness:
> Avery Smith is 46 year old male who presents today for right ankle pain. He states he has had a recurrent cyst to the lateral aspect of his right ankle greater than a year. He states he ha had several rupture and draining of the cyst over the last year. He endorses pain with prolonged walking and standing. He wears a sandal for comfort. He denies pain in office today. He denies PNH of DM. He denies numbness, tingling or burning.

The medical provider from UAB Orthopedics set forth as follows on Mr. Smith's chart with regards to the MRI.

> Impression and plain
> Foot/ankle Diagnosis:
> Soft tissue mass
> 1. Will schedule MRI with possible aspiration
> 2. Encourage supportive shoes
> 3. RTC after MRK
> 4. All questions were answered prior to leaving the office today. Patient advised to call the office with questions or concerns.

An MRI was taken at UAB Orthopedics on June 5, 2017. The MRI was read as follows:

> Results:
> Ankle bilateral AP Lat mortise, foot bilateral routine AP Lat oblique.
> Clinical information: Palpable ankle mass ICD: M 25.579 pain in unspecified ankle and joints of unspecified foot.
> Comparisons: none
> Findings/Conclusion: There is focal soft tissue prominence along the lateral aspect of the right ankle, which likely

corresponds to the patient's palpable abnormality. Remaining soft tissues of the bilateral ankles and feet appeal within normal limits.

No acute fracture, subluxation or aggressive osseous lesion of either foot or ankle is identified. There is mild hallux valgus deformity bilaterally with mild underlying DJD of the first MTP joints, greater on the left. Bilateral pes planus with resultant mild mid-foot degenerative changes are also noted. Remaining joint spaces appeal well maintained without significant arthropathy.

Mr. Smith was thereafter seen again at UAB Orthopedics on June 5, 2017. The physician noted in his report as follows:

US guided fine needle aspiration.

Clinical information: 46 year old man with palpable right ankle soft tissue mass.

Comparison: MRI of the right ankle performed earlier on same day.

Technique: Informed consent was obtained from patient. Full explanation of the nature of the procedure, alternatives and risks were discussed, including risks of bleeding, infection and inability to treat with needle technique. Adjacent vascular and organ injury were also fully discussed. Patient expressed understanding and a desire to proceed. Formal timeouts were performed, per protocol. Localization of the target abnormality was performed. Following a septic preparation of the skin using Chlorhexidine and 2% Lidocaine local anesthetic, real time ultrasound guidance was used to perform aspiration of the right ankle complex cyst with a 18-gauge needle. Approximately 6 ml. gelatinous blood-tinged fluid was aspirated from the collection. Material was submitted to microbiology for culture, sensitivity, gram stain, cell count, aerobic, anaerobic, and acid fast bacillus. Follow up imaging demonstrated no evidence of hemorrhage and no immediate complication. There was near complete decompression of the cyst on post procedure scan. The patient tolerated the procedure well and was discharged from the radiology department in unchanged condition.

Estimated blood loss: less than 5cc.

Findings: There is a complex, loculated cyst lesion along the lateral aspect of the ankle with multiple internal echogenic foci

and septations.   The cyst is avascular on power Doppler imaging and measures 2.9x1.9x3 cm.

Conclusion:  Technically successful aspiration of the complex cyst along the lateral aspect of the right ankle.  Approximate 6 cc of gelatinous, blunted blood tinged material was aspirated from the collection and sent immediate to microbiology for the above studies.

Mr. Smith had a follow up appointment with UAB Orthopedics on June 12, 2017.   The medical provider, after examining Mr. Smith, wrote in the medical chart as follows:

Chief Complaint:

Patient complains of right foot.

History of Present Illness:

Avery Smith is a 46 year old male who presents today for scheduled follow up after MRI and aspiration of right foot cyst. He states after drainage the cyst returned.  He denies pain with the cyst.  He has no pain with ambulation.

Impression and plan:

Foot/ankle Diagnosis:

Ganglion cyst of foot.

POC discussed with Dr. Shah.

1.  May continue to WBAT without restrictions.

2.  Patient with several aspirations of cyst.  Will need surgical removal in the future.

3.  RTC PRM

4.   All questions were answered prior to leaving the office today.   Patient advised to call the office with questions or concerns.

Mr. Smith will . . . continue to be monitored for issues related to the cyst on his ankle.  If the cyst returns, arrangements will be made to have the cyst surgically removed at UAB.

. . . Mr. Smith's necessary medical needs have at no time been delayed or denied.

Doc. No. 8-1 at 2–3; Doc. 89-1 at 3–10; Doc. 67-1 at 3–8 (internal paragraph numbers omitted) (asterisks indicate progression to next sequential cited affidavit).[2]

With respect to the request by Smith on November 21, 2016, three days prior to Thanksgiving on November 24, 2016, that the surgery scheduled with Dr. Chung to remove the ganglion cyst be cancelled, Dr. Peasant provides the following information:

> Mr. Smith was in fact seen by Dr. Chung on November 16, 2016.  Dr. Chung discussed the removal of the ganglion cyst on Mr. Smith's right ankle and Mr. Smith, according to Dr. Chung's medical notes, agreed to proceed with the surgery.

> On November 21, 2016, however, Smith signed a Release of Responsibility stating that he did not want to go forward with the removal of the cyst as recommended by Dr. Chung [and the surgery scheduled for November 22, 2016 was cancelled].

> Thereafter, on . . . November 22, 2016, Smith completed a Sick Call request asking that the surgery be rescheduled to remove the cyst on the right ankle. [This sick call request was received in the health care unit on November 23, 2016.]

> As previously stated, Mr. Smith, the very previous day, had stated that he did not want to go forward with the surgery.

> Appointments for outside orthopedists cannot be made as quickly as patients/inmates desire.  An appointment has to be scheduled with the outside orthopedist and then security has to be approved through the Alabama Department of Corrections and once the appointment is made with the outside orthopedist, transportation has to be arranged with the ADOC.

> . . . .

> Smith's refusal [to undergo surgery on the scheduled date] and thereafter [his] request for surgery obviously slowed the process down to make [a second] appointment for Smith [to undergo an off-site surgery] by Dr. Chung.

---

[2]Thus, the orthopedic specialists at UAB confirmed Dr. Peasant's diagnosis of a ganglion cyst.

> At no time between November 16, 2016 when Dr. Chung recommended surgery, and the time that I saw Smith on December 9, 2016[, a day after his cyst ruptured, was Smith] in any need of emergency medical treatment.  The safety of Smith was never [in risk of] harm any time during that period.
>
> Subsequent to December 9, 2016, a follow-up appointment was made with Smith to be seen by Dr. Chung and Smith was seen by the orthopedic specialist . . . on December 13, 2016.
>
> Thereafter, as set forth in my [previous supplemental affidavit, Doc. 67-1,] Mr. Smith has been seen by UAB Orthopedic Specialists and was followed by me until Smith's transportation to another correctional facility.
>
> Mr. Smith is no longer under my medical control since he has been transferred to another correctional facility.

Doc. 95-1 at 2–4 (internal paragraph numbers omitted).

In an affidavit filed in response to a motion for preliminary injunction filed by Smith, Dr. Peasant explains that "[o]ff-site referrals are requested by me as the site medical director only if medically necessary.  The fact that Mr. Smith had ongoing litigation had absolutely nothing to do with Mr. Smith's approval or [lack of] approval to be seen by an off-site medical specialist."  Doc. No. 39-1 at 6.  Nurse Burks, the Health Services Administrator ("HSA") at Ventress whose primary responsibility was to administer the health care unit and respond to grievances, in clarifying her response to a grievance filed by Smith, provides the following information:

> Mr. Smith was asserting in his medical grievance that he needed to be seen by off-site medical specialists due to the fact that he could not be seen by either me and/or Dr. Peasant because we are defendants in a civil action filed by Mr. Smith.
>
> My response to Mr. Smith's medical grievance was to communicate the fact that merely because Mr. Smith had a pending lawsuit did not mean that he

had the automatic right to be seen by an off-site medical specialist.  I meant to communicate to Mr. Smith that he still had to file a sick call [request] if he had any medical issues and to be seen by Dr. John Peasant as the Medical Director at the Ventress Correctional Facility

If Dr. Peasant . . . was of the opinion that Mr. Smith needed to be seen by an off-site medical specialist, then it would be Dr. Peasant and Dr. Peasant alone who would have made the decision as to whether Mr. Smith need to be seen by an off-site medical specialist.

I, as the Health Services Administrator, do not have any authority to make the determination as to whether Mr. Smith will be seen by an off-site medical specialist.

What I meant to communicate to Mr. Smith [in the grievance response addressing his being seen by off-site medical specialists] was merely that he still needed to go through the correct channels in order to seek medical care as an inmate incarcerated at the Ventress Correctional Facility.  The fact that he had filed a civil action against me and Dr. Peasant did not give him immediate access to off-site medical specialists.

Doc. 45-1 at 4.

As to lab results revealing a bacterial infection, Dr. Peasant advises that "[o]n December 9, 2016, [he] personally ordered antibiotics and those antibiotics were provided to Mr. Smith for the bacteria, Proteus Mirabilis."  Doc. No. 39-1 at 7.  Dr. Peasant further avers that:

Mr. Smith has been continuously treated by me, the other medical providers, and the nurses at Ventress Correctional Facility.

Each time Mr. Smith has sought medical treatment, he has been seen in the health care unit by the medical providers. . . .

Mr. Smith's medical condition is adequately treated by me as the Medical Director, as well as the other medical providers and nurses at Ventress Correctional Facility.

Doc. No. 39-1 at 78.

Dr. French addresses the deliberate indifference claim lodged against him as follows:

> . . . . I have never evaluated or spoken with Mr. Smith personally. To the best of my knowledge, my involvement in Mr. Smith's medical care is limited to the interpretation of two diagnostic studies. Mr. Smith received x-ray evaluation of the right ankle at Baptist Medical Center East on September 25, 2014 as ordered by Dr. Tai Chung. I interpreted the x-rays and found soft tissue prominence distal to the lateral malleolus. I suggested that follow up evaluation with MRI may be beneficial.
>
> Mr. Smith received [the recommended] MRI of the right ankle at Open Air MRI of Troy in Troy, Alabama on October 23, 2014 as ordered by Dr. John Peasant. I interpreted the MRI study and identified an osteochondral lesion in the medial talar dome measuring approximately 5 mm. I also identified a multilocular cystic lesion anterior and inferior to the lateral malleolus, the largest of which measured approximately 2.2 x 2.0 cm, and smaller cysts with some low T2, intermediate T1 signal. I noted some surrounding subcutaneous edema in this region without convincing soft tissue mass. The area did not appear to connect with the joint. No osseous destruction was appreciated. Some mild edema within Kager's fat pad was noted. I further noted that the etiology of the fluid collection adjacent to the distal fibula was uncertain and that it could represent some type of sebaceous cyst, atypical ganglion and much less likely soft tissue malignancy. I recommended orthopedic consultation.
>
> In providing care to Mr. Smith I was practicing within my specialty as a board certified Radiologist. . . . At all times during my care of Mr. Smith, I exercised the same degree of care, skill, and diligence that other board certified Radiologists would have exercised in a like or similar case. All of the care and treatment which I rendered to Mr. Smith met or exceeded the applicable standard of care.

Doc. 51 at 26. After reviewing Smith's medical records, including the MRI results, and consulting with Dr. Hood, Dr. Peasant, in his medical judgment, determined that an additional consultation with an off-site orthopedist was not necessary at that time. Doc. 89-1 at 8. Finally, Dr. Hood maintains that his only involvement in Smith's treatment occurred on two occasions — the first instance transpired during the aforementioned

consultation with Dr. Peasant in October of 2014 about the possible referral of Smith to Dr. Chung for a second consultation, Doc. 23-1 at 8, and the next "occasion was on December 12, 2016 where I approved a scheduled visit for Mr. Smith to be seen by Dr. Chung." Doc. 23-1 at 3–4.

After a thorough and exhaustive review of the entire record in this case, including the medical records, the court concludes that the course of treatment undertaken by the medical defendants did not violate Smith's constitutional rights.  Specifically, there is no evidence upon which the court could conclude that Corizon, Dr. Peasant, Nurse Burks, Dr. Hood or Dr. French provided treatment to Smith in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  Rather, the evidence before the court demonstrates that medical personnel, including the nursing staff at Ventress and Dr. Peasant, routinely examined Smith for his complaints regarding the cyst on his right ankle, prescribed medication to Smith in an effort to treat his condition, and ordered diagnostic and imaging tests to aid in determining the appropriate course of treatment for Smith.  Dr. Peasant discussed a potential free-world orthopedic consultation with Dr. Hood in October of 2014, which Dr. Peasant eventually deemed unnecessary as he determined Smith's condition could be adequately monitored on-site, but did later approve an off-site orthopedic consultation for Smith in December of 2016.  With respect to Dr. French, he merely interpreted diagnostic studies performed on Smith.  Whether any of the medical defendants "should have employed  additional diagnostic techniques or forms of treatment

'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citing *Estelle*, 429 U.S. at 107).  In addition, to the extent Smith complains that these defendants should have pursued modes of treatment other than that prescribed, this allegation does not rise to the level of deliberate indifference.  *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

In sum, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference.  "Although [Smith] attempts to overcome summary judgment by offering his own sworn statement . . . to support his allegations, the contemporaneous medical records and opinions of the examining medical doctors show that this purported evidence is baseless."  *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010).  Thus, the conclusory statements submitted by Smith alleging a lack of due care and deliberate indifference do not create a dispute of fact in the face of the contradictory, contemporaneously created medical records.  *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013)

(same).  In addition, Smith has failed to present any evidence showing that the manner in which the medical defendants addressed his condition created a substantial risk to his health that the defendants consciously disregarded.  The record is therefore devoid of evidence — significantly probative or otherwise — showing that the defendants or any other medical professional acted with deliberate indifference to a serious medical need experienced by Smith.  Consequently, summary judgment is due to be granted in favor of defendants on Smith's deliberate indifference claims.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be DISMISSED with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

On or before **December 26-, 2019**, the parties may file objections to this Recommendation.  The parties must specifically identify the factual findings and legal conclusions contained in the Recommendation to which his objection is made.  Frivolous, conclusive, or general objections will not be considered by the court.  Failure to file written objections to the proposed factual findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and

legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact [and law] and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done this 11th day of December, 2019.


_____/s/  Charles S. Coody_____
UNITED STATES MAGISTRATE JUDGE